**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

CAROLE R. KONRATH,            )
                             )
            Plaintiff,        )
                             )          No. CIV 04-179-TUC-CKJ
vs.                          )
                             )          **ORDER**
AMPHITHEATER  UNIFIED  SCHOOL )
DISTRICT NO. 10, et al.,      )
                             )
            Defendants.       )
_____ )

Pending before the Court is Defendants' First Motion for Summary Judgment (Statutes of Limitations) [Doc. # 83], Defendants' Second Motion for Summary Judgment (Substantive Issues) [Doc. # 85] and Defendants' Motion to Strike Response to Motion [Doc. # 99]. Argument regarding these motions was presented to the magistrate judge on August 9, 2006. Also pending before the Court is the Motion for Sanctions for Spoliation of Evidence against Defendants [Doc. # 65]. Argument regarding this motion was presented to the magistrate judge on May 8, 2006.

I. *Factual and Procedural Background*

Plaintiff Carole R. Konrath ("Konrath") has been employed as an art teacher at the Lulu Walker Elementary School, Amphitheater School District ("Walker"), since 1966. Defendant Roseanne Lopez ("Lopez") became the principal of Walker in 1999. Defendant Todd Jaeger ("Jaeger") is employed by the Amphitheater Unified School District No. 10 ("District") as an Associate to the Superintendent.

1      In 1996, Konrath was diagnosed with autoimmune ear disease; Konrath asserts this

2  disorder is permanent and Konrath will never be able to hear from her left ear with

3  technology available to date.  Konrath further asserts that she has no usable hearing in her

4  left ear and the hearing in her right ear is severely reduced.  Konrath further asserts that her

5  hearing fluctuates with immunologic stimuli and reacts negatively to environmental stressors

6  and allergies.  Konrath testified during her deposition that, with her hearing aid adjusted

7  correctly, her hearing in the classroom environment is what *she would consider normal*[1] and

8  that when she knows there is going to be some kind of loud noise, she will adjust her

9  hearing aid to get rid of the extra loudness.  Konrath takes allergen shots twice a week and

10  is on an elimination rotation diet, as prescribed by her doctor.

11      In June 1999, Konrath disclosed the diagnosis to the District and requested

12  reasonable accommodations.  Lopez learned of the diagnosis in 1999.  Defendants assert that

13  Konrath did not provide sufficient information regarding her disability because she did not

14  provide requested information to a doctor designated by the District for an independent

15  medical opinion with regard to her hearing loss.

16      Konrath was assigned to Harelson Elementary School part-time and to Walker part-

17  time for the 1999-2000 school year.  On May 8, 2000, Konrath made a Formal Grievance

18  Presentation regarding requests for reasonable accommodations.   In July 2000,

19  Superintendent Vicky Balentine ("Balentine") assigned Konrath to teach full-time at Walker

20  as an accommodation.

21      Lopez noted in her evaluation of Konrath in the spring of 2000 that it did not appear

22  to her that Konrath had provided a plan that laid out goals, objectives, and behaviors for

23  students over any extended period of time, did not describe what could be expected to be

24  seen from the children as a result of participating in Konrath's class, and there were minimal

25  displays of student art in the school.  Therefore, Lopez asserts, she rated Konrath with a

26

27      [1]Konrath testified that, by normal hearing ability, she meant "to function[.]"  Konrath

28  deposition, p. 39, ll. 21-24.

need to improve in long-range instructional planning. All teachers under Lopez' supervision are required to have some form of a long-term instructional plan. According to Lopez, teachers who meet requirements of planning competency can show or explain what children will be doing in the classroom; in other words, the long-term plans are not always required to be in writing.

In September 2000, the noise environment of Room 27 at Walker, where Konrath had taught for many years, was changed: the District installed a new air conditioner and air ducts on the roof of the art room. This created a very loud background noise when the blowers were on. In the fall of 2000, Konrath complained about the noise in the art room to Lopez and informed her that it was interfering with her teaching. At some point, she also informed Lopez that the sound vibrations coming from the soft drink machine in the faculty lounge interfered with her ability to hear during teachers' meetings. In October 2000, Konrath sent a memorandum to Jaeger notifying him that she had explained to Lopez that the blowers interfered with her teaching and requested the noise be adjusted; she further informed him about the noise vibrations from the soft drink machine and that she had spoken to Lopez to no avail. In October 2000, Lopez submitted a request to the District office for accommodations of Konrath's condition. Lopez did not discuss what equipment might help Konrath prior to requesting the equipment. A school council meeting was moved to the library where Konrath was able to hear. Faculty meetings have been held in the library; Konrath cannot hear people in the back of the library during meetings.

On October 18, 2000, Lopez sent a Memorandum to Konrath informing her that a decibel reading in the classroom was lower (40-41 decibels) with the new system than what it had been with the old system (45-46 decibels). Konrath asserts that the testing was done without children in the classroom.

In December 2000, the District installed a large walk-in room freezer next to the west wall of the art room. Konrath complained that the blower in the freezer was loud and interfered with her teaching. Lopez testified during her deposition that it was not a "fact that that teacher in this case, Ms. Konrath, could not hear in the room where she was relocated."

1   Lopez Deposition, 274:15-17.

2      On March 26, 2001, Lopez placed Konrath on an improvement plan.   The

3   improvement plan required Konrath to develop a written long-term plan for the art program.

4   On April 5, 2001, Lopez stated in writing that one of Konrath's strengths was long-range

5   instructional planning and project selection.

6      In the spring of 2001 Lopez prepared an improvement plan for Konrath, indicating

7   that one of the outcomes that she expected was the development of a long-term plan for the

8   art curriculum.   Konrath refused to sign the improvement plan because she disagreed with

9   the notion that an improvement plan was necessary.   Konrath submitted an outline for a

10  long-time instructional plan, at which point Lopez dropped the improvement plan.   Lopez

11  informed Konrath that the long-term plan still needed work and improvement in which

12  Konrath needed to cooperate.

13     On April 9, 2001, Konrath made a Formal Grievance Presentation regarding the

14  alleged retaliation and harassment and the failure to accommodate her.   Konrath testified

15  that Lopez responded to Konrath's grievance and denied the grievance.

16     In June or July of  2001, Lopez required Konrath to justify the use of any supplies

17  and to include this in her long-term plan.   Lopez testified that she required all teachers to

18  justify requests that exceeded their base budgets and that she sometimes required other

19  teachers to verbally state in their long-term plans what supplies they needed.

20     In the spring of 2002 Lopez conducted a formal evaluation of Konrath's performance,

21  including Konrath's need to complete the long-range plan for the art program in a format

22  that is easy to understand and distribute.   On April 15, 2002, Konrath's performance

23  regarding instructional planing was rated by Lopez as acceptable or beyond expectations.

24  Lopez also rated Konrath as needing improvement in behavior management and professional

25  attitudes and behaviors.

26     On May 14, 2002, Konrath made a Formal Grievance Presentation regarding the way

27  Lopez had handled a parent complaint and about a reference in her evaluation to her

28  referrals of students to the responsibility room.

On May 17, 2002, Konrath made a Formal Grievance Presentation regarding the disciplinary actions and disparate treatment in retaliation for reasonable accommodations. Konrath testified that Lopez responded to Konrath's grievance.

In July 2002, Jaeger notified Konrath in writing that she was going to be relocated to Room 2.  The District stated that the move to the new classroom was viewed as an effective way of accommodating Konrath's condition.  Konrath responded in writing that she felt the relocation was in retaliation and that, if she had been consulted, she would have explained that Room 2 is physically unsuitable for her to teach art.  On August 2, 2002, Konrath made a Formal Grievance Presentation regarding the classroom assignment in retaliation for requesting reasonable accommodation.  Vicky Balentine referred the grievance to Jaeger.

On August 2, 2002, Konrath made a Formal Grievance Presentation regarding the relocation of her classroom.  Jaeger responded that the issue of the location of a teacher's classroom was not grievable.  Konrath testified that Lopez also responded to and denied the grievance.

Konrath filed a charge of discrimination, No. 02-0449, with the Arizona Attorney General, Civil Rights Division ("ACRD") on August 8, 2002, regarding the District's failure to accommodate her and the unfair disciplinary measures in retaliation for her requests for reasonable accommodation.[2]  The ACRD investigated the charge and dismissed charge No. 02-0449 on October 30, 2003.

On August 20, 2002, Konrath made a Formal Grievance Presentation regarding working conditions and reasonable accommodations.

On September 25, 2002, Konrath made a Formal Grievance Presentation regarding

---

[2]Konrath had previously filed charges of discrimination: Charge No. 99-0433 was filed on August 6, 1999.  The ACRD investigated the charge and dismissed charge No. 99-0433 on September 19, 2000.  Charge No. 00-0044, was filed on October 29, 1999.  The ACRD investigated the charge and dismissed charge No. 00-0044 on March 28, 2002.

an Improvement Plan she had received from Lopez, working conditions in the classroom, and lack of reasonable accommodation.  The District responded that the grievance was untimely.

On or about February 5, 2003, Konrath filed a Formal Grievance Presentation regarding events that had taken place in late in November and December of 2002.  Lopez responded that the grievance would not be responded to as untimely.

On or about April 6, 2003, Lopez rated Konrath's long-range plan for art below expectations and needing improvement.  On April 24, 2003, Konrath made a Formal Grievance Presentation regarding the evaluations, the lack of communication on her request for accommodations, and the lack of reasonable accommodations.  The District responded that evaluations were not grievable.  Konrath testified at deposition that she agreed that evaluations were not grievable, but the thought processes of evaluations are grievable.

On June 13, 2003, Lopez provided Konrath with the Improvement Plan.  The written Improvement Plan stated that the expected outcome was the development of a comprehensive long-term plan for the Walker art program.  Konrath met with Lopez on several occasions and told her that she could not understand what Lopez wanted because she was already doing the things included within the Improvement Plan.  During the months of August, September, and October 2003, Konrath submitted long-term plans to Lopez.  On or about November 23, 2003, Konrath provided Lopez with a written *lesson* plan that incorporated objective, procedures, and activities to accomplish objectives, a time line, and assessment which, according to Lopez' testimony, was within an acceptable range.

In July 2003, the District agreed to move Konrath to Room 1 North.  The District and Konrath agreed that this classroom was suitable, appropriate, and satisfactory for Konrath's needs and desires regarding classroom environment.  Konrath has been in Room 1 North since August 2003.  Konrath asserts that accommodations are still required because, at times, she cannot hear the children and because she cannot hear the telephone.  The parties dispute whether a student runner is consistently used and whether such use is an adequate

1  accommodation.[3]

2      Following a medical evaluation in August 2003 and the physician's view that
3  Konrath could not perform playground duty, Konrath has not been required to perform
4  playground duty.   Additionally, the District has accommodated Konrath's manner of
5  performing cafeteria duty.

6      On September 30, 2003, Konrath filed a Formal Grievance Presentation regarding the
7  thought processes that led to two needs improvement evaluations and the District's failure
8  to provide reasonable accommodations.  Lopez responded that evaluations and improvement
9  plans are not grievable.  Jaeger responded that the District would not process the grievance
10  further because the thought processes behind evaluations were not grievable.

11      On November 25, 2003, Lopez rated Konrath as unsatisfactory in the criteria of
12  Instructional Planning.

13      Lopez prepared a formal remediation plan for Konrath.  The parties dispute whether
14  the remediation plan included a set of expected outcomes, certain administrative assistance
15  that would be provided to help Konrath address the issues in the plan, and certain timelines
16  for action.

17      On or about November 19, 2003, Konrath made a Formal Grievance Presentation
18  regarding Lopez' placement of Konrath on a remediation plan, disability discrimination, and
19  retaliation.  Lopez responded that all matters attendant to the evaluation were not grievable.

20      On or about December 2, 2003, Lopez sent a memorandum to Patrick Nelson[4]
21  informing him that she had submitted a recommendation to Balentine that Preliminary
22  Notice of Non-Renewal be issued to Konrath because of Konrath's lack of cooperation and
23  lack of having a plan.  The recommendation was submitted to Balentine on or about

---

26      [3]It appears the student runner's role was to relay information/messages between
Konrath and the school office.

28      [4]It is not clear who Mr. Nelson is or what position he may hold at Walker or with the
District.

1   December 3, 2003.

2       On January 6, 2004, the District hand-delivered a Preliminary Notice of Inadequacy

3   of Classroom Performance to Konrath.

4       During January and February of 2004, Konrath submitted drafts of long-term plans

5   for Lopez' approval.  Konrath testified that Lopez provided feedback regarding a draft long-

6   term plan.  However, Lopez did not find the plans acceptable.  Lopez testified at deposition

7   that she provided information regarding the things that needed to be included in the long-

8   range plan in meetings with Konrath; she further testified that she provided written notes to

9   Konrath.

10      In April 2004, Lopez conducted a formal evaluation conference with Konrath.  Lopez

11  concluded that Konrath had submitted a suitable and acceptable long-term instructional plan

12  and informed Konrath that she had overcome the deficiencies previously identified.  Lopez

13  recommended that the District renew Konrath's contract for the 2004-05 school year.

14  Konrath's employment has continued without interruption since the spring of 2004; Konrath

15  has not been terminated, been demoted, been transferred, or received a pay cut.

16      Konrath has repeatedly requested that her grievances be addressed by the Board

17  pursuant to District Policy G-1805, Section III.

18      Konrath took November 18, 2002; November 19, 2002; September 16, 2003;

19  September 17, 2003; September 18, 2003, September 19, 2003; March 9, 2003, and; March

20  10, 2003, as sick days.  She has alleged that the sick days were the result of Defendants'

21  failure to accommodate her requests for reasonable accommodations, the discrimination

22  against her, and the retaliation against her for filing grievances and requesting reasonable

23  accommodations.

24      Konrath mailed a Notice of Claim under A.R.S. § 12-821.01, dated November 26,

25  2003, to Defendants.  The District received the notice on December 1, 2003.

26      On February 18, 2004, Konrath filed a Complaint in the Superior Court, in and for

27  the County of Pima.  The Complaint alleges that, after Konrath notified the District of her

28  diagnosis in 1999, she has endured repeated harassment, discrimination, and retaliation by

1   Defendants, to wit:  Lopez repeatedly subjected Konrath to undeserved discipline, repeated

2   unfair performance evaluations, and placed her on unjustified performance improvement and

3   remedial action plans.    Konrath further alleges that Defendants have repeatedly refused

4   Konrath's repeated requests for reasonable accommodations for her disability.  Konrath also

5   alleges that the District has refused to address Konrath's use of the grievance procedures at

6   the different levels.    Konrath asserts that, because of Defendants' actions, she has suffered

7   damage to her hearing, severe emotional distress, lost wages and diminished earning

8   capacity.    Konrath asserts a claim against the District for violation of the Americans with

9   Disabilities Act and breach of her implied contractual rights.    Further, Konrath asserts a

10  claim against Lopez and Jaeger for tortious interference with Konrath's employment

11  relationship with the District.    After the Complaint was filed, Lopez rated Konrath as

12  acceptable in all competence areas.

13          The action was removed to this Court on April 16, 2004.

14          The parties proceeded with discovery.  Konrath asserts that her June 25, 2004, First

15  Request for Production of Documents included a request for copies of all long-term plans

16  and weekly lesson plans required of any certified Amphitheater District teacher from 1999.

17  Konrath asserts that she sought such documents to show that other teachers were not

18  disciplined for not having such lesson plans. Following a Motion to Compel, the magistrate

19  judge issued an Order compelling Defendants to produce the requested documents and

20  imposed a monetary sanction. Defendants did not comply with the Order and, on November

21  23, 2005, Konrath filed a Motion for Order Rendering Judgment by Default as Sanction.

22  The magistrate judge's Order of January 3, 2006, found that, although Defendants had

23  violated court orders, the prejudice did not rise to a level that warranted the sanction of

24  default judgment.  Konrath has since discovered that Defendants did not seek to gather or

25  preserve the requested documents until after the magistrate judge issued his January 3, 2006,

26  order.  When counsel for Konrath visited different elementary schools to review the long

27  term plans and weekly plans, it was discovered that a majority of the teachers had destroyed

28  what they referred to as their long term plans and most of their weekly plans for the years

1999 through 2004.  Further, the destruction of many of the plans occurred after June of 2004.

On March 27, 2006, Konrath filed a Motion for Sanctions for Spoliation of Evidence [Doc. # 65].  Konrath asserts that, had Defendants complied with their duty to respond to Konrath's discovery request in a timely manner, the destruction could have been avoided.  Konrath asserts that Defendants' answer should be stricken and default judgment should be entered against Defendants.  Defendants have filed a Response and Konrath has filed a Reply.  The parties presented oral argument to the magistrate judge on May 8, 2006.  The magistrate judge informed the parties that discovery would be extended to permit depositions of the other teachers (the details were to be decided by the parties) and took the matter under advisement.  This Court has reviewed a transcript of that proceeding.

On May 19, 2006, Defendants filed their First Motion for Summary Judgment (Statutes of Limitations) [Doc. # 83] and their Second Motion for Summary Judgment (Substantive Issues) [Doc. # 85].  Konrath has filed Responses to both Motions for Summary Judgment and has included disputes as to some of Defendants' statements of fact.  Defendants have filed Objections to and Motion to Strike Certain of Plaintiff's Statement of Facts (Merits) [Doc. # 95].  Defendants have also filed Replies to the Responses to the Motions for Summary Judgment.  Defendants have also filed a Motion to Strike Response to Motion [Doc. # 99].  Konrath has filed a Response to this Motion and Statements of Fact in Support of her Response.  Argument regarding these motions was presented to the magistrate judge on August 9, 2006.  The magistrate judgment took the matter under advisement.  This Court has reviewed a transcript of that proceeding.

In Konrath's Opposition to Defendants' First Motion for Summary Judgment (Statutes of Limitations), Response to Defendants' Separate Statement of Facts (Statutes of Limitations) and during oral argument, Konrath clarified that she is not claiming any damages for any acts that occurred 300 days prior to the filing of her Charge of Discrimination or 180 days prior to her submission of her Notice of Claim.  Rather, Konrath believes these prior acts will establish that Defendants had knowledge of Konrath's

1  disability and her requests for reasonable accommodations prior to her Discrimination

2  Charge and Notice of Claim.

3

4  II. *Motion for Sanctions for Spoliation of Evidence*

5      Konrath has requested this Court to issue an order striking Defendants' answer and

6  rendering judgment by default against Defendants as a sanction under Fed.R.Civ.P.

7  37(b)(2)(C). Konrath asserts that she has discovered that Defendants did not seek to gather

8  or preserve the requested documents until after the magistrate judge issued his January 3,

9  2006, order. Defendants do not dispute this assertion. Konrath further asserts that the

10  destruction of many of the plans occurred after June of 2004, and that, had Defendants

11  complied with their duty to respond to Konrath's discovery request in a timely manner, the

12  destruction could have been avoided. Defendants, however, assert that many of the other

13  teachers indicated that they routinely destroy any plans at the end (or even in the middle)

14  of the school year and other innocent reasons were set forth (e.g., computer crash).

15  Defendants assert that Konrath has not shown that the plans were destroyed after June 2004.

16      Defendants also assert that the extreme sanction requested by Konrath requires a

17  showing that Defendants wilfully destroyed evidence in their possession and that the

18  destruction has prejudiced Konrath in a manner rising to a level that would interfere with

19  the rightful decision of the case. Defendants assert that the documents were never in their

20  possession. Konrath asserts, however, that the documents were in the control of Defendants

21  as evidenced by their failure to direct Konrath to serve the other teachers, as non-parties,

22  with subpoenas requesting the plans. *See* Fed.R.Civ.P. 34(c) and 45.

23      Although Defendants did not maintain copies of the documents, when requested by

24  Defendants, the other teachers provided those documents still available. Further, Defendants

25  did not assert that they did not possess or have control of the documents in their failure to

26  comply with the initial request for documents. The Court finds the documents were in the

27  control of Defendants.

28      A party who knowingly and purposefully permits its employees to destroy key

documents and records after it had knowledge these key documents were relevant or requested in the litigation is subject to sanctions under Fed.R.Civ.P. 37. *Wm. T. Thompson Co. v. GNC*, 593 F.Supp. 1443, 1455 (C.D.Cal. 1984) (default or dismissal may be appropriate where party willfully destroys documents and records such that the opposing party is deprived of the opportunity to present critical evidence to the jury). Konrath appears to assert that Defendants' failure to request the documents from the other teachers after the initial discovery request, the order to compel, and the filing of the first request for sanctions evidences knowing and purposeful conduct. Defendants have not set forth any reason why they did not timely comply with the discovery requests or orders of the Court.[5] However, Defendants do assert that, to any extent documents were discarded by the other teachers, those teachers decided whether to retain copies or not. Defendants assert that the loss of the documents was the result of "an innocent failure to preserve evidence" for which an extreme sanction is not appropriate. *Souza v. Fred Carries Contracts, Inc.*, 191 Ariz. 247, 250, 955 P.2d 3, 6 (App. 1997).

Defendants seek to distinguish *Thompson* because that case involved records that were created and maintained by defendant itself. However, Fed.R.Civ.P. 34 is not limited to those items in the possession of a defendant, but those items also in the control of a defendant. Defendants' distinction of *Thompson* on this ground, therefore, is inconsequential. Defendants also distinguish *Thompson* on the ground that there was no affirmative representation that the records would be maintained and a court order directing Defendants to continue maintaining the records. Although there was no affirmative representation that the records would be maintained in this case, Defendants had an ongoing duty to preserve evidence. *State of Idaho Potato Commission v. G & T Terminal Packaging,*

---

[5]Defendants assert that they complied with the Court's order after resolution of Defendants' objections. The magistrate judge's September 30, 2005, Order found that Defendants' objections, filed 113 days after they were initially due, were untimely. Furthermore, Defendants' assertion does not address why the request to the other teachers was not made until after the magistrate judge's September 30, 2005, Order.

1    *Inc.*, 425 F.3d 708, 720 (9th Cir. 2005) (generally approving the principle that a party to

2    litigation bears a general obligation to preserve evidence).  Furthermore, although there was

3    no court order directing Defendants to maintain the records, following September 30, 2005,

4    there was *an Order directing Defendants to produce the requested documents*.  The specious

5    distinction made by Defendants cannot obviate the apparent attempts by Defendants to avoid

6    and/or delay disclosure of these materials.  This Court can only conclude that Defendants'

7    conduct was knowing and purposeful.  *See e.g., Leon v. IDX Systems Corp.*, 464 F.3d 951,

8    959 (9th Cir. 2006) ("A party's destruction of evidence qualifies as willful spoliation if the

9    party has "some notice that the documents were *potentially* relevant to the litigation before

10   they were destroyed."); *Akiona v. United States*, 938 F.2d 158,161 (9th Cir. 1991) (where

11   "plaintiffs have not shown any bad faith in the destruction of the records," district court

12   erred in applying adverse inference).

13        Konrath further asserts that Defendants' conduct rises to a level that interferes with

14   the rightful decision of the case and warrants a default judgment.  She asserts that her main

15   claim is that she was held to a higher standard than other teachers similarly situated to her

16   in retaliation for requesting reasonable accommodations.  Had Defendants complied with

17   the requirements of Fed.R.Civ.P. 34, she would be able to demonstrate that Defendants did

18   not require other teachers to even prepare plans.  Defendants assert, however, in light of the

19   innocent and/or routine disposal of the plans, that loss of the documents is not the result of

20   Defendants' improper conduct.  Further, Defendants assert that Konrath has not shown that

21   other teachers cannot testify about the existence and/or content of any long term or weekly

22   plans.  In other words, the existence of comparable evidence precludes a finding that

23   Konrath is prejudiced to the extent that it interferes with a rightful decision in this case.

24        Defendants assert that it complied in good faith with the Court's order by providing

25   the plans it was able to locate.  In the event the Court disagrees, Defendants assert that a

26   more appropriate sanction would be an adverse inference instruction and /or an appropriate

27   restriction on evidence.  Konrath asserts that such a sanction is insufficient because she has

28   the burden of proving that she was treated less favorably than other teachers similarly

1    situated.   Konrath further asserts that an alternate sanction of the Court ruling is "an
2    established fact in the case that Defendants held Ms. Konrath to a higher standard than other
3    teachers similarly situated in the District would not provide Ms. Konrath with the impact the
4    destroyed evidence would have had with the jury."  Reply, p. 8.

5         "There are two sources of authority under which a district court can sanction a party
6    who has despoiled evidence:   the inherent power of federal courts to levy sanctions in
7    response to abusive litigation practices, and the availability of sanctions under Rule 37
8    against a party who 'fails to obey an order to provide or permit discovery.'"  *Leon*, 464 F.3d
9    at 958, *quoting Fjelstad v. Am. Honda Motor Co.*, 762 F.2d 1334, 1337-38 (9th Cir. 1985).
10   The Ninth Circuit has stated:

11           Before imposing the "harsh sanction" of dismissal, however, the district court should
             consider the following factors:  "(1) the public's interest in expeditious resolution of
12           litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the
             party seeking sanctions; (4) the public policy favoring disposition of cases on their
13           merits; and (5) the availability of less drastic sanctions."

14   *Leon*, 464 F.3d at 958, *quoting Anheuser-Busch, Inc. v. Natural Beverage Distribs.*, 69 F.3d
15   337, 348 (9th Cir. 1995).[6]  Here, the delay between the filing of the motion for sanctions and
16   the magistrate judge's direction to complete depositions of other teachers and the issuance
17   of this Order makes consideration of the first two factors to be of nominal importance.  As
18   discussed by the magistrate judge during argument on this issue, alternate methods of proof
19   are available to Konrath, thereby minimizing the risk of prejudice to Konrath.  Moreover,
20   there is a strong public policy favoring disposition on the merits and less drastic sanctions
21   are available.

22        The Court finds the imposition of sanctions to be appropriate.  The Court finds that
23   Defendants shall pay Konrath's reasonable attorney's fees for the preparation and
24   completion of the pleadings and argument regarding the Motion for Sanctions for Spoliation
25   of Evidence.  The Court further finds that Defendants shall pay a reasonable amount of

26

27           [6]This case does not involve a requested dismissal but, rather, a requested default
28   judgment.

1   Konrath's attorney's fees for the depositions of other teachers regarding the long-term plans.

2   Additionally, the parties may submit pre-trial pleadings regarding whether an adverse

3   inference jury instruction and /or an appropriate restriction on evidence at trial is

4   appropriate.

5

6   III.  *Objections/Disputes to Statement of Facts*

7        The parties have has included objections/disputes to each other's statements of facts.

8   A "genuine" issue of "material" fact cannot be created by a party simply making assertions

9   in its legal memoranda.  *S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v.*

10  *Walter Kidde & Co.*, 690 F.2d 1235 (9th Cir. 1980).  Declarations and other evidence that

11  would not be admissible may be stricken.  *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478,

12  484 (9th Cir. 1991).  Indeed, a "conclusory, self-serving affidavit, lacking detailed facts and

13  any supporting evidence, is insufficient to create a genuine issue of material fact." *Nilsson*

14  *v. City of Mesa*, — F.3d — , 2007 WL 2669788 *2 n. 2 (9th Cir. 2007).  Moreover,

15  statements must allege personal knowledge.  *See Skillsky v. Lucky Stores, Inc.*, 893 F.2d

16  1088, 1091 (9th Cir. 1990) ("Like affidavits, deposition testimony that is not based on

17  personal knowledge is hearsay is inadmissible and cannot raise a genuine issue of material

18  fact sufficient to withstand summary judgment.").

19       The objections/disputes place the statements in context and clarify them.  The

20  objections/disputes are overruled, but the Court advises the parties that it will only consider

21  the admissible evidence that is supported by specific facts that may show a genuine issue

22  of material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505,

23  2510, 91 L.Ed.2d 202 (1986).

24

25  IV.  *Summary Judgment Standard*

26       Summary judgment is appropriate where "there is no genuine issue as to any material

27  fact." Fed. R. Civ. P. 56(c).  A party moving for summary judgment has the initial burden

28  to demonstrate, "with or without supporting affidavits[,]" the absence of a genuine issue of

material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), quoting Fed.R.Civ.P. 56. The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *quoting* the Advisory Committee Note to 1963 Amendment of Fed.R.Civ.P. 56(e), 28 U.S.C.App., p. 626.

A material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. at 2510. Indeed, an issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* Thus, the "mere scintilla of evidence" in support of the nonmoving party's claim is insufficient to defeat summary judgment. *Id.* at 252. However, in evaluating a motion for summary judgment, "the evidence of the nonmoving party is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. Further, a court "[must] not weigh the evidence[, make credibility determinations,] or determine the truth of the matter" at the summary judgment stage, but may only determine whether there is a genuine issue for trial. *Abdul-Jabbar v. General Motors Corp.*, 85 F.3d 407, 410 (9th Cir. 1996); *Balint v. Carson City, Nevada*, 180 F.3d 1047, 1054 (9th Cir. 1999); *see also Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1328 (9th Cir. 2000) (recognizing that on a motion for summary judgment, "a district court is entitled neither to assess the weight of the conflicting evidence nor to make credibility determinations").

Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "set forth specific facts showing that there is a genuine [material] issue for trial." *Id.,* internal quotes omitted. In opposing summary judgment, plaintiff is not entitled to rely on the allegations of his complaint, Fed.R.Civ.P. 56(e), or upon conclusory

1    allegations in affidavits.  *Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992).

2    Further, "a party cannot manufacture a genuine issue of material fact merely by making

3    assertions in its legal memoranda."  *S.A. Empresa de Viacao Aerea Rio Grandense (Varig*

4    *Airlines) v. Walter Kidde & Co.*, 690 F.2d at 1238.

5         The Court is not to make credibility determinations with respect to the evidence

6    offered and is required to draw all inferences in a light most favorable to the non-moving

7    party.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th

8    Cir. 1987), citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106

9    S.Ct. 1348, 89 L.Ed.2d 538 (1986).   Summary judgment is not appropriate "where

10   contradictory inferences may reasonably be drawn from undisputed evidentiary facts[.]"

11   *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324 (9th Cir. 1980).

12

13   V.  *Motion for Summary Judgment (Statutes of Limitations)*

14        Defendants assert that Konrath is precluded from raising the claims that she raised

15   in her first two charges of discrimination with the ACRD.  Those two charges were filed on

16   August 6, 1999, and on October 29, 1999.  Defendants also assert that any of Konrath's

17   claims that accrued before June 4, 2003, which is more than 180 before the District received

18   her Notice of Claim on December 1, 2003, are barred by A.R.S. §12-821.01(S).   In

19   Konrath's Response to Defendants' Separate Statement of Facts (Statute of Limitations) and

20   during oral argument, Konrath clarified that she is not claiming any damages for any acts

21   that occurred 300 days prior to the filing of her Charge of Discrimination or 180 days prior

22   to her submission of her Notice of Claim.  In other words, the parties agree that the claims

23   raised in the first two charges of discrimination are precluded by the statute of limitations.[7]

24        Additionally, Konrath does not dispute Defendants' assertion that, because all actions

25

26        [7]Konrath believes these prior acts will establish that Defendants had knowledge of

27   Konrath's disability and her requests for reasonable accommodations prior to her
     Discrimination Charge and Notice of Claim.  The admissibility of the prior acts is not before

28   the Court at this time.

against public entities and employees are subject to a one-year statute of limitations, A.R.S. § 12-821, Konrath's state-law claims that occurred prior to February 19, 2003, are barred.

A.  *Claims that Occurred More Than 240 Days Before the Filing of the Charge with the ACRD*

Before an ADA claim can be filed in court, the claimant must file an administrative charge of discrimination with the EEOC.  42 U.S.C. § 12117; 42 U.S.C. § 2000e-5(e), (f); *see generally Deppe v. United Airlines*, 217 F.3d 1262, 1266-67 (9th Cir. 2000).  "Although ordinarily the administrative charge must be filed within 180 days of the alleged unlawful employment practice, the deadline is extended to 300 days if the charge is initially filed with a state agency that enforces its own anti-discrimination laws."   *EEOC v. Dinuba Medical Clinic*, 222 F.3d 580, 585 (9th Cir. 2000); *see also* 42 U.S.C. § 2000e-5(e); *Santa Maria v. Pacific Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000).  The ACRD has been designated as a state agency that enforces its own anti-discrimination laws.  *See* 40 Fed.Reg. 8818 (1975). Because the ACRD and the EEOC have designated each other as their agents for receipt of charges, Konrath's filing her charge of discrimination with the ACRD constituted constructive receipt by the EEOC of the charge of discrimination.  *Dinuba Medical Clinic*, 222 F.3d at 585.

Defendants assert that, although the filing of the charge with the ACRD is constructive receipt by the EEOC, because of the statutorily-prescribed "deferral" period within which the ACRD has exclusive jurisdiction, the receipt of the charge by the EEOC was not effective until 60 days after the filing with the ACRD.  42 U.S.C. § 2000e-5(c); *Dinuba Medical Clinic*, 222 F.3d at 585; *EEOC v. Commercial Office Products Co.*, 486 U.S. 107, 110-11, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988).  Although the charge of discrimination was filed with the ACRD on August 8, 2002, Defendants assert that the charge is not deemed to having been received by the EEOC until October 7, 2002. Defendants assert, therefore, that Konrath may not proceed with any claim under the ADA on any matters alleged to have occurred prior to December 11, 2001 (300 days prior to

1   October 7, 2002). "When a defendant employer specifically denies that a plaintiff has
2   exhausted his administrative remedies, the burden of proof rests with plaintiff to show that
3   he has satisfied the requirement." *McBride v. Citgo Petroleum Corp.*, 281 F.3d 1099, 1105
4   (10th Cir. 2002).

5       Konrath asserts, however, that the United States Supreme Court has clearly
6   established that acts of alleged discrimination are actionable only if the claimant files a
7   charge with the EEOC within 300 days of the occurrence of the discriminatory acts.
8   *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153
9   L.Ed.2d 106 (2002). Konrath emphasizes that the Supreme Court stated 300 days, not 240,
10  which would account for the deferral period. In their Reply, Defendants distinguish *Morgan*
11  because that case involved the claimant filing his charge of discrimination directly with the
12  EEOC.[8] Defendants appear, in other words, to be asserting that there was no reason for the
13  Supreme Court to question the 300-day limit in that factual scenario.[9]

14       "The net effect of sections 2000e-5(c) and 2000e-5(e) is that a complainant who
15  wishes to file a charge of discrimination with the EEOC must file the charge with the
16  appropriate state or local agency within 240 days of the alleged discriminatory conduct in
17  order to ensure that the charge may be filed with the EEOC within the 300-day limit."
18  *Green v. Los Angeles County Superintendent of Schools*, 883 F.2d 1472, 1473-74 (9th Cir.
19  1989). "If the charge is filed with state agency after the 240th day, however, it will be
20  deemed timely filed with the EEOC only if state proceedings are terminated prior to the
21  lapse of the 300th day." *Dinuba Medical Clinic*, 222 F.3d at 585; *see also Marrero v. Goya*
22  *of Puerto Rico, Inc.*, 304 F.3d 7, 17 n.2 (1st Cir. 2002) ("A complainant in a deferral State
23  . . . need only file his charge within 240 days of the alleged discriminatory employment

25       [8]The Court notes that claimant cross-filed with the state agency.

27       [9]The Court notes that the 300 days limit was the relevant time period, as opposed to
    the 180 day limit, because there was an appropriate state agency to which a charge of
28  discrimination could be filed.

practice in order to insure that his federal rights will be preserved.  If a complainant files later than that (but not more than 300 days after the practice complained of), his right to seek relief under Title VII will nonetheless be preserved if the State happens to complete its consideration of the charge prior to the 300-day period.").

The Ninth Circuit has recognized that the terms of a Worksharing Agreement may affect the time within which a claimant must file a charge of discrimination.  *Laquaglia v. Rio Hotel & Casino, Inc.*, 186 F.3d 1172 (9th Cir. 1999).  In *Laquaglia*, the court recognized that "the state agency has a 60-day period in which it has the initial right to process the discrimination claim" and that, as a practical matter, the claimant must have filed her claim "within 240 days of the alleged discrimination to ensure timely filing with the EEOC, or the state agency must have terminated its proceedings before expiration of the 300-day period." 186 F.3d at 1174.  However, "a state 'terminates' its proceedings if it has waived the 60-day deferral period in a cooperative agreement – known as a worksharing agreement – between the state agency and the EEOC."  186 F.3d at 1175, *citing Commercial Office Prods. Co.*, 486 U.S. at 112-122.  Waivers in worksharing agreements are "self-executing, meaning that a charge filed with the state agency before the 300-day filing deadline expires is deemed automatically filed with the EEOC on the same day."  *Laquaglia*, 186 F.3d at 1175. Therefore, Konrath had 300 days to file her claim if the ACRD and the EEOC "had a worksharing agreement that waived the 60-day deferral provision for her type of charge." *Id*.

The Worksharing Agreement between the ACRD and the EEOC for the fiscal year 2002 provided, *inter alia*:

> In recognition of the statutory authority granted to the ACRD by Section 706(c) and 706(d) of Title VII, as amended, and by Title I of the Americans with Disabilities Act, and the transmittal of charges of age discrimination pursuant to the Age Discrimination in Employment Act of 1967, the primary responsibility for resolving charges between the ACRD and the EEOC will be divided as follows:
>
> A.   EEOC and the ACRD will process all Title VII, ADA, and ADEA charges that they originally receive except as indicated below:
>
>    1.   For charges originally received by the EEOC and/or to be initially processed by the EEOC, the ACRD waives its right of exclusive

jurisdiction to initially process such charges for a period of 60 days for the purpose of allowing the EEOC to proceed immediately with the processing of such charges before the first day.

2.    In addition, EEOC will initially process the following charges:

* * * * *

– All Title VII/ADA charges jurisdictional with the ACRD and received by the ACRD 240 days or more after the date of violation[.]

* * * * *

3.    The ACRD will initially process the following types of charges:

* * * * *

– Any charge alleging retaliation for filing a charge with the ACRD or cooperating with the ACRD[.]

* * * * *

Defendants' Separate Statement of Facts, Motion for Summary Judgment (Statutes of Limitations), Exhibit 8, pp. 3-4. Defendants have asserted that, pursuant to the Worksharing Agreement, the ACRD had the responsibility for resolving the charge. Konrath has not disputed this assertion. In other words, there is no factual dispute regarding this issue.[10] The Court finds, therefore, that because the ACRD had the responsibility to resolve the charge, Konrath was required to "file a charge of discrimination . . . with the appropriate state or local agency within 240 days of the alleged discriminatory conduct in order to ensure that the charge may be filed with the EEOC within the 300-day limit." *Green*, 883 F.2d at 1473-74. Defendants, therefore, are entitled to summary judgment on this issue. Any claims, therefore, that occurred more that 240 days prior to the August 8, 2002, Charge of Discrimination have not been exhausted and are barred by the statute of limitations.

---

[10]The case law does not specifically address whether the interpretation of a Worksharing Agreement is a factual or legal determination. However, even where a contract is facially ambiguous, it may be interpreted by the court as a matter of law where "there is no evidence that would support a [reasonable] conflicting interpretation of the agreement." *America First Inv. Corp. v. Goland*, 925 F.2d 1518, 1522 (D.C.Cir. 1991); *see also GoTo.com v. The Walt Disney Co.*, 202 F.3d 1199, 1204 (9th Cir. 2000) (contract interpretation is a question of law). Here, Konrath has not alleged or argued that any evidence supports a conflicting interpretation of the Worksharing Agreement.

B. *Claims that Post-Date the Dismissal of Konrath's Charge of Discrimination*

Defendants agree that the exhaustion requirement is satisfied with respect to matters that appeared in or could reasonably be expected to arise out of the August 8, 2002, charge of discrimination.   Defendants assert, however, that Konrath has not satisfied the administrative prerequisite to a lawsuit on claims that post-date the dismissal of the August 8, 2002, charge.  In support of this assertion, Defendants rely upon *Vasquez v. County of Los Angeles*, 349 F.3d 634 (9th Cir. 2003) (employee's retaliation claim based on his filing of discrimination charge with EEOC was not administratively exhausted).  Defendants assert, therefore, that they are entitled to summary judgment on Konrath's claim of the November 25, 2003, evaluation because that incident occurred after the dismissal of her August 8, 2002, charge of discrimination.  In their Reply, Defendants more clearly assert that if issues arise during the course of the agency's investigation, or reasonably could have been expected to so arise, those issues would be a proper subject of subsequent litigation.  *Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990).  But where the claim arose after the dismissal of the charge by the agency, the agency clearly has not had an opportunity to fulfill the statutory mandate of investigation prior to suit and, therefore, those claims have not been exhausted.

Konrath asserts that incidents subsequent to the filing of a discrimination charge at the EEOC or state agency are included in the charge and, therefore, administratively exhausted if they are reasonably related to or grow out of the earlier incidents upon which the original charge was made.  Indeed, Konrath points out that "to force an employee to return to the state agency every time he claims a new instance of discrimination in order to have the EEOC and the courts consider the subsequent incidents along with the original ones would erect a needless procedural barrier.  *Oubichon v. North American Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir. 1973), *citing Love v. Pullman Co.*, 404 U.S. 522, 527, 92 S.Ct. 616, 30 L.Ed.2d 679; *Ramirez v. Nat. Distillers & Chemical Corp.*, 586 F.2d 1315, 1320 (9th Cir. 1978); *EEOC v. Farmer Bros. Co.*, 31 F.3d 891 (9th Cir. 1994); *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091 (9th Cir. 2002).

1    Konrath distinguishes *Vasquez* on the basis that the claimant did not present the legal

2    theory of unlawful retaliation and the operative facts were not related to the facts in the

3    EEOC charge.   Indeed, the retaliation claim in the judicial complaint was against an

4    individual not involved in the allegations included in the initial discrimination charge.  Here,

5    Konrath asserts, her charge of discrimination alleged that the cause of the discrimination was

6    based on retaliation and also that she had been unfairly disciplined; the unfair discipline in

7    retaliation for her reasonable accommodation requests and the unfair discipline after the

8    August 8, 2002, charge of discrimination were all committed by Lopez.  Moreover, Konrath

9    asserts in her charge of discrimination that the District retaliated against her because of her

10   complaints and requests for reasonable accommodation by undeserved and unfair discipline

11   and by the relocation of her classroom.  Konrath asserts that all acts alleged after the charge

12   of discrimination are related to and grow out of the continuing pattern of retaliatory

13   disciplinary actions and retaliation for her charge that she had been refused reasonable

14   accommodations.

15   The disagreement between the parties, therefore, appears to be whether the

16   subsequent incident (i.e., the claim regarding the November 25, 2003, evaluation), is

17   reasonably related to or grew out of the earlier incidents that were included in the August

18   8, 2002, charge.  Allegations of discrimination that are not included in an EEOC charge of

19   discrimination are not exhausted unless the new charges of discrimination "'are like or

20   reasonably related to the allegations contained in the EEOC charge.'" *Lyons v. England*, 307

21   F.3d 1092, 1104 (9th Cir. 2002), *quoting Green*, 883 F.2d at 1475-76.  In other words,

22   charges of discrimination that were a part of the ACRD/EEOC's investigation or could be

23   within the scope of the ACRD/EEOC's investigation that could reasonably arise from the

24   asserted charges may proceed.  *Farmer Bros. Co.*, 31 F.3d at 899, *quoting Sosa v. Hiraoka*,

25   920 F.2d at 1456, *emphasis and footnote omitted.*[11]

26

27   _____

28   [11]A failure of exhaustion in the form of a failure to timely file an administrative claim
     is not jurisdictional and may be raised as an affirmative defense to the claim.  *Zipes v. Trans*

1    Courts are to construe any charges filed with the EEOC liberally when determining

2    whether a plaintiff's claims are reasonably related to those EEOC charges.  *Yamaguchi v.*

3    *United States Dept. of the Air Force*, 109 F.3d 1475, 1480 (9th Cir. 1997).  However, "the

4    charge must at least describe the facts and legal theory with sufficient clarity to notify the

5    agency that employment discrimination is claimed."  *Ong. v. Cleland*, 642 F.2d 316, 319

6    (9th Cir. 1981).  Indeed, "[a] claimant's failure to amend his charge to include a new claim

7    is essentially the same as a claimant's failure to file an EEOC charge for the new claim."

8    *Albano v. Schering-Plough Corp.*, 912 F.2d, 384, 387 (9th Cir. 1990).

9    Claims of discrimination that were not included in a timely-filed EEOC charge may

10   not be considered by a district court unless the new claims are "like or reasonably related

11   to" the allegations contained in the EEOC charge.  *Lyons v. Engalnd*, 307 F.3d at 1104,

12   *quoting Green*, 883 F.2d at 1475-76.  New claims may be construed as reasonably related

13   to allegations in an EEOC charge when those claims are "consistent with the plaintiff's

14   original theory of the case."  *B.K.B.*, 276 F.3d at 1100.  "If closely related incidents occur

15   after a charge has been filed, additional investigative and conciliative efforts would be

16   redundant."  *Brown v. Puget Sound Elec. App. & Train. Trust* 732 F.2d 726, 730-31 (9th

17   Cir. 1984).  "'To require a second "filing" by the aggrieved party [] would serve no purpose

18   other than the creation of an additional procedural technicality.'"  *Id*., *citing Ramirez*, 586

19   F.2d at 1320.

20   In determining whether a claim is "reasonably related" to an EEOC charge, the

21   charge filed with the EEOC is construed "'with utmost liberality since they are made by

22   those unschooled in the technicalities of formal pleading.'"  *B.K.B.*, 276 F.3d at 1100;

23   *Yamaguchi*, 109 F.3d at 1480.  Indeed, "courts should not use Title VII's administrative

24   procedures as a trap for unwary *pro se* civil-rights plaintiffs . . .  We . . . , therefore, when

25   appropriate, construe civil-rights and discrimination claims charitably."  *Duncan v. Delta*

26   *Consol. Industries, Inc.*, 371 F.3d 1020, 1025 (8th Cir. 2004), *citation omitted*.  Nonetheless,

27   _____

28   *World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982).

1   "[a]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC

2   charge would circumscribe the EEOC's investigatory and conciliatory role, as well as

3   deprive the charged party of notice of the charge, as surely as would an initial failure to file

4   a timely EEOC charge." *Id.*, *citation omitted*.

5       In determining whether claims are "like or reasonably related to" claims that a

6   plaintiff did not identify in her administrative charge, the court is to consider "such factors

7   as the alleged basis of the discrimination, dates of discriminatory acts specified within the

8   charge, perpetrators of discrimination named in the charge, and any locations at which

9   discrimination is alleged to have occurred. *B.K.B.*, 276 F.3d at 1100. Additionally, the

10  court should consider a plaintiff's claims to be reasonably related to allegations in the charge

11  of discrimination to the extent that those claims are consistent with the plaintiff's original

12  theory of the case. *B.K.B.*, 276 at 1100, *citing Farmer Bros. Co.*, 31 F.3d at 899 (ruling that

13  plaintiff exhausted her claim for discriminatory layoff since that claim was always a part of

14  the plaintiff's theory of the case as expressed in her explicit allegations of discriminatory

15  failure to recall and to rehire laid-off female employees).

16      Defendants assert that Konrath's November 25, 2003, Formal Grievance Presentation

17  regarding Lopez' placement of Konrath on a remediation plan, disability discrimination, and

18  retaliation is not exhausted. This Formal Grievance Presentation involved similar conduct

19  to that which was the basis of Konrath's Charge of Discrimination – in her Charge of

20  Discrimination, Konrath alleged claims of retaliation, age discrimination, and disability

21  discrimination; specifically, Konrath alleged that she had been refused reasonable

22  accommodations, had been subjected to undeserved discipline and harassment, and was not

23  allowed to fully present her grievances. Moreover, the conduct had occurred just a short

24  time after the ACRD dismissed charge No. 02-0449 on October 30, 2003. Further, the

25  perpetrators alleged in the November 25, 2003, Formal Grievance Presentation (Lopez,

26  Jaeger, and the District) had been the subject of Konrath's allegations in the Charge of

27  Discrimination. Additionally, the actions alleged in the November 25, 2003, Formal

28  Grievance Presentation occurred at Walker, where the allegations constituting Konrath's

1    Charge of Discrimination occurred.[12]

2         Moreover, Konrath's Charge of Discrimination alleged that the cause of the

3    discrimination was based on retaliation (for her complaints and requests for reasonable

4    accommodations) and that she had been unfairly disciplined.  Her new claim is that she,

5    again, was being discriminated against and being unfairly disciplined in retaliation.

6    Konrath's November 25, 2003, claim is consistent with her original theory of the case.  This

7    alleged act of discrimination is related to and grew out of the continuing pattern of

8    retaliatory disciplinary actions and retaliation for her charge that she had been refused

9    reasonable accommodations.

10        Defendants assert, however, that because the alleged discrimination occurred after

11   ACRD's dismissal, the claim has not been exhausted.  The Ninth Circuit has made clear that

12   acts of discrimination that occur after a charge is filed may be exhausted if they are

13   reasonably related to the charge of discrimination.  *Couveau v. American Airlines, Inc.*, 218

14   F.3d 1078, 1082 (9th Cir. 2000) ("Specifically, it may include acts of discrimination that

15   occur after the charge is filed.").  The Ninth Circuit has not specifically determined that an

16   act of discrimination that occurs after the dismissal of the charge of discrimination is *per se*

17   non-exhausted.  Indeed, in *Vasquez*, the Ninth Circuit pointed out that the claimant's new

18   claim had occurred "even after the EEOC had issued its right-to-sue letter.  The EEOC could

19   not have investigated that incident because it had not yet happened at the time the EEOC

20   was conducting its investigation."  349 F.3d at 645.  However, the court also noted that the

21   new charge involved a different perpetrator, that the claimant had not presented the same

22   legal theory, and that the operative facts were not related to the facts in the EEOC charge.

23   In other words, the Ninth Circuit was considering the factors as previously set forth in this

24   Order.  *See B.K.B.*, 276 F.3d at 1100.  Notably, the Ninth Circuit did not state a *per se* rule

25   that the conduct that is the basis of a new claim must have occurred before a right-to-sue

26

27        [12]Balentine assigned Konrath to teach at Walker full-time in July 2000.  No evidence

28   has been presented that Konrath has been assigned to a different school since then.

1    letter was issued.  The Court finds that Konrath's November 25, 2003, claim is reasonably

2    related to or grew out of Konrath's Charge of Discrimination.  The allegations of that claim

3    have been sufficiently exhausted.

4

5    C. *State Law Claims that Post-Date Konrath's Submission of her Notice of Claim*

6            Defendants assert that two of Konrath's claims that she was damaged by the fact that

7    she had taken specified sick days post-date her Notice of Claim.  Without citing to any

8    authority, Defendants assert that, because a Notice of Claim was not submitted as to those

9    claims, Konrath may not pursue those state-law claims.  Konrath relies on *Graber v. City*

10   *of Peoria*, 156 Ariz. 553, 753 P.2d 1209 (App. 1988), for her assertion that the continuing

11   condition of the retaliatory disciplinary actions, failure of the District to provide reasonable

12   accommodations, and severe emotional distress is the subject of the lawsuit does not require

13   the submission of a separate Notice of Claim.  Konrath asserts that the notice purpose of the

14   claims statute was fulfilled by the original Notice of Claim and that Defendants are on

15   notice of all claims from the same ongoing discriminatory conduct, retaliatory conduct, and

16   failure to provide reasonable accommodations.  Konrath further asserts that the Notice of

17   Claim provided the District an opportunity to investigate the claim, assess its liability, and

18   obtain a settlement.  *Mammo v. State*, 138 Ariz. 528, 675 P.2d 1347 (App. 1983).

19   Defendants distinguish *Graber* on the basis that *Graber* permitted additional damages for

20   the same initial wrongful act rather than discrete wrongful acts.  Konrath asserts, however,

21   that it is the same continuing failure to reasonably accommodate her that has caused the

22   injuries; she further asserts she is, therefore, suffering continuing damages.

23           "Section 12-821.01(A) requires a person who has a claim against a [public entity or

24   a public employee] to file the claim with [with the person authorized to accept service]

25   within 180 days 'afer the cause of action accrues.  Any claim not filed within that time 'is

26   barred and no action may be maintained thereon."  *Barth v. Cochise County, Arizona*, 213

27   Ariz. 59, 62, 138 P.3d 1186, 1189 (App. 2006), *citation omitted*.  This  requirement

28   "constitutes a 'procedural rather than a jurisdictional requirement[.] *McGrath v. Scott*, 250

1    F.Supp.2d 1218 (D.Ariz. 2003).[13]

2         Contrary to Defendants' assertions, the court in *Graber* did not permit the suit

3    because the plaintiffs only suffered additional damages; the court stated that the plaintiffs

4    were seeking "additional damages for subsequent injuries."  156 Ariz. at 556, 753 P.2d at

5    1212.  Nonetheless, the subsequent injuries (and damages) in *Graber* were the result of the

6    same source.  In *Graber*, the injuries were caused by the defendant's failure to replace of

7    sewer line that resulted in sewage overflow, flooding on the city's streets, and flooding in

8    the plaintiffs' homes.  The court found that subsequent notices of claims were not needed

9    for the ongoing tort of nuisance.  Here, alleged ongoing discriminatory conduct resulted in

10   additional injuries and damages.  This required affirmative ongoing discriminatory conduct.

11   The Court has not been provided any basis to extend the court's holding in *Graber* that

12   subsequent notices of claims were not needed for the ongoing tort of nuisance to affirmative

13   discriminatory conduct.  Indeed, the tort required passive conduct (not repairing the sewer

14   line) as opposed to affirmative conduct (discriminatory acts).  The Court finds summary

15   judgment in favor of Defendants is appropriate on Konrath's claims regarding her sick days

16   that post-date her Notice of Claim.

17

18   VI.  *Good Faith at Reasonable Accommodations*

19         In their Motion for Summary Judgment, Defendants discuss the accommodations

20   they made.  Additionally, they argue that they have satisfied their statutory duty because the

21   accommodations they have made enables Konrath to perform the essential functions of her

22   job.  *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996); *Hoffman v. Caterpillar,*

23   *Inc.,* 256 F.3d 568 (7th Cir. 2001).  However, as asserted by Konrath, the Ninth Circuit

24   Court of Appeals has discussed the legislative history regarding an employer's obligations

25

26         [13]A litigant is not required to exhaust administrative remedies when such an effort
     would be futile.  *Moulton v. Napolitano*, 205 Ariz. 506, 513, 73 P.3d 637, 644 (App. 2003).
27   In this case, however, Konrath has not alleged or made any showing that submitting a Notice
     of Claim would have been futile.
28

1   regarding reasonable accommodations:  "employers first will consult with and involve the

2   individual with a disability in deciding on the appropriate accommodation." *Barnett v. U.S.*

3   *Air, Inc.*, 228 F.3d 1105, 1111 (9th Cir. 2000), *reversed in part on other grounds*.  Indeed,

4   the Ninth Circuit held:

5           [E]mployers who fail to engage in the interactive process [to identify appropriate
            accommodations] in good faith, face liability for the remedies imposed by the statute
6           if a reasonable accommodation would have been possible.  We further hold that an
            employer cannot prevail at the summary judgment stage if there is a genuine dispute
7           as to whether the employer engaged in good faith in the interactive process.

8   *Barnett*, 228 F.3d at 1116.

9           However, Defendants appear to assert that they were not able to engage in an

10  interactive process because Konrath did not provide an independent medical examination

11  or, to state it another way, in their Objections to and Motion to Strike Certain of Plaintiff's

12  Statement of Facts (Merits), Defendants imply that requesting the independent medical

13  examination was engaging in an interactive process.  However, no evidence has been

14  presented that Konrath was advised that the completion of an independent medical

15  examination was a prerequisite to Defendants discussing with her reasonable

16  accommodations.  If Defendants did not advise Konrath that providing an independent

17  medical examination was required to engage in an interactive process regarding reasonable

18  accommodations, this Court cannot say that there is no factual dispute as to whether timely

19  Defendants acted in good faith.  Moreover, without being advised what actions she must

20  take before Defendants would discuss with her appropriate accommodations, Konrath did

21  not have an opportunity to "identify effective reasonable accommodations." *Id.*, at 1116.

22  Although Defendants may have made accommodations, without an interactive process made

23  in good faith, "there may have been other, unmentioned possible accommodations." *Id*, at

24  1116.   Further, an earlier interactive process may have resulted in more timely

25  accommodations.

26          During oral argument, Defendants agreed that the District is obligated to meet with

27  Konrath in designing accommodations.  Defendants asserted that the ACRD process and

28  memorandums *to* Konrath (as opposed to discussions *with* Konrath) constituted an

1  interactive process.  The Court finds that there is a factual dispute as to whether Defendants

2  engaged in a timely interactive process with Konrath regarding accommodations.  Summary

3  judgment on this issue is not available.

4

5  VII.  *Disparate Treatment Discrimination and Retaliation*

6        A plaintiff claiming disparate treatment discrimination or retaliation must prove that

7  the employer acted with a discriminatory motive:  "That is, the plaintiff's [disability or

8  protected activity] must have actually played a role in the employer's decisionmaking

9  process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing*,

10  530 U.S. 133, 141, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000), internal quotes omitted.

11  In this case, there is no direct evidence that gives rise to an inference of discrimination.  *See*

12  *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) ("Direct evidence

13  essentially requires an admission by the decision-maker that his actions were based on the

14  prohibited animus").   Where a disparate treatment claim is proved by circumstantial

15  evidence, the three-step, burden-shifting analysis of *McDonnell Douglas Corp. v. Green*,

16  411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is used.  *See Reeves*, *supra* (United

17  States Supreme Court assumes Title VII burden-shifting framework applies in ADEA cases).

18  Similarly, the burden-shifting analysis "that governs disparate treatment claims also governs

19  retaliation claims." *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987).

20        Under the burden shifting analysis, the initial burden of production is on Konrath to

21  establish a *prima facie* case of discrimination and retaliation.  This burden on summary

22  judgment is "minimal and does not even rise to the level of a preponderance of the

23  evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994), *citing Yartzoff*, 809

24  F.2d at 1375.  Rather, Konrath "need only offer evidence which 'gives rise to an inference

25  of unlawful discrimination.'" *Wallis*, 26 F.3d at 889, *quoting Lowe v. City of Monrovia*, 775

26  F.2d 998, 1005 (9th Cir. 1985).

27

28

VIII.  *Prima Facie Case of Disparate Treatment Discrimination*

Generally, to establish a prima facie case of disparate treatment, a plaintiff must show that "(1) she belongs to a protected class; (2) she was performing according to her employer's legitimate expectations; (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably." *Godwin v. Hunt Wesson, Inc.* 150 F.3d 1217, 1220 (9th Cir. 1998); *Vasquez.*  However, the Supreme Court noted in *McDonnell Douglas* that, because the facts vary, the four factors may not be necessarily applicable in all situations.  411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13.  Additionally, a mere showing that there was disparate treatment is not sufficient; rather Konrath must show that the alleged disparate treatment was the result of intentional discrimination based upon her protected class characteristics.  *EEOC v. Flasher Co., Inc.*, 986 F.2d 1312, 1314 (10th Cir. 1992).

A.  *Protected Class – Qualified Individual with a Disability*

Defendants assert that, because Konrath's hearing is "stable," she is not a qualified individual with a disability.  42 U.S.C. § 12112(a).  Indeed, Defendants assert that her medical condition is not a disability because it does not "substantially limit[] one or more of [her] major life activities.  42 U.S.C. § 12102(2).  In support of this assertion, Defendants point out that her hearing loss, as mitigated by her hearing aids, does not substantially limit her major life activities.  *See e.g., Santiago Clemente v. Executive Airlines, Inc.*, 213 F.3d 25, 30-32 (1st Cir. 2000) (plaintiff's hearing loss as mitigated "cannot be reasonably construed to have substantially limited her major life activities); *Miller v. Taco Bell Corp.*, 204 F.Supp.2d 456, 461-63 (E.D.N.Y. 2002).

Defendants further assert Konrath's statement that it was difficult for her to work in some of the particular classrooms to which she was assigned does not convert her medical condition into a disability.  *See e.g., Rhoads v. FDIC*, 257 F.3d 373, 389 (4th Cir. 2001) (inability to work in particular workplace did not constitute a disability).  Indeed, Defendants asserts that Konrath was supposedly limited from working in certain classrooms;

in her current classroom, she has been able to function effectively.  Because "the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most peoples' daily lives, not whether the claimant is unable to perform the tasks associated with her specific job[,]" *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002), Defendants assert that Konrath's condition cannot be said to substantially limit her life activity of working.

Konrath asserts, however, the physical impairment of autoimmune ear disease affects her hearing and autoimmune system.  Further, Konrath asserts that the Ninth Circuit has described hearing and eating as major life activities.  *Fraser v. Goodale*, 342 F.3d 1032, 1039 (9th Cir. 2003).  Additionally, the First Circuit has found that an ear disorder such as Konrath's is a physical impairment and that hearing is a major life activity.  *Santiago Clemente*.

Specifically addressing Defendants' argument, Konrath asserts that not all mitigating measures cure a person of an underlying impairment.  Indeed, a person can follow a treatment regimen and yet be more impaired at some times than at others.  *Fraser*, 342 F.3d at 1039.  Moreover, the side effects of a mitigating measure can also be impairing.  *Murphy v. United Parcel Service, Inc.*, 527 U.S. 516, 521, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999).  Konrath also asserts that the burden of the mitigating measures, including her special rigorous diet, must be considered.  Konrath asserts that because her diet has a substantial impact in the major life activity of eating, that may *per se* be considered a disability.  *Fraser*, 342 F.3d at 1039.  In considering that impact, it is substantial limitations on major life activities, rather than utter inabilities, that is to be considered.  *Bragdon v. Abbott*, 524 U.S. 624, 641, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

The parties dispute, and point to different testimony to establish, how Konrath's condition affects her major life activities.  For example, in Defendants' Motion for Summary Judgment [Doc. # 85], they assert Konrath has normal hearing ability to function at home when her hearing aid is adjusted properly, her hearing in the classroom is what she would consider normal, she can hear effectively when the blowers in the classroom are turned off,

1  when there is no background noise in the classroom she can talk on the telephone or be

2  assisted by the use of a runner from the office.  Additionally, when there are a lot of people

3  talking around her, she can ask the person speaking to her to look at her and talk directly to

4  her; similarly, when there is a lot of noise in the classroom, she can have a child turn

5  directly to her, ask the child to talk louder, go outside of the classroom to speak to the child,

6  or use visual signals to understand the child.  Contrary to Defendants' assertions, Konrath

7  asserts in her Reply to Defendants' Statement of Facts [Doc. # 92] that her condition does

8  not allow her to hear as a normal individual, that noises that may be within limits for a

9  normal individual may be too loud or too low for her, that even with her hearing aid in her

10  right ear, her hearing is substantially restricted – although her hearing is stable, it fluctuates

11  due to environmental elements and stress and is likely never to improve, that she tries for

12  her hearing to be normal if it's not interfering with other sounds[14], and that the use of

13  runners was largely discontinued in 2002.

14       Moreover, Konrath asserts in her Response to the Motion for Summary Judgment

15  [Doc. # 91], that the disorder disrupts her hearing, eating, and balance,  that even with a

16  hearing aid she cannot hear as an average individual hears, that she is affected by

17  environmental allergens, loud environments and background noise, that she cannot hear on

18  a cellphone, and that she needs the assistance of a trained dog at home to notify her if her

19  telephone is ringing or if someone is at the door, and that she cannot travel alone because

20  she cannot hear what is said through speakers or intercom systems.  Defendants assert,

21  however, in their Objections to and Motion to Strike Certain of Plaintiff's Statement of Facts

22  (Merits) [Doc. # 95] that Konrath's assertion that her diet substantially limits her activity of

23  eating, eating at restaurants, or activities are legally conclusory statements that are not

24  statements of fact.  Similarly, Defendants dispute Konrath's assertion that her hearing is

25  substantially reduced, restricted, and substantially limits her daily activities as these are

26

27          [14]Konrath testified that, by normal hearing ability, she meant "to function[.]"  Konrath

28  deposition, p. 39, ll. 21-24.

1 legally conclusory statements.  Defendants also dispute Konrath's assertion that she cannot

2 travel alone because the statement upon which that conclusions rests only asserts that she

3 cannot hear speech from distortion-containing speaker systems.  Defendants also asserts that

4 one incident of falling when she turned to greet a child does not support Konrath's assertion

5 that her balance problems cause her to fall down "sometimes."  Defendant also object to

6 Konrath's use of an affidavit to contradict her deposition testimony.  *Block v. Los Angeles*,

7 253 F.3d 410, 419 n. 2 (9th Cir. 2001); *Radobenko v. Automated Equip. Corp.*, 520 F.2d

8 540, 544 (9th Cir. 1975).

9      The ADA defines a "qualified individual" as "an individual with a disability who,

10 with or without reasonable accommodation, can perform the essential functions of the

11 employment position that such individual holds or desires." 42 U.S.C. § 12111(8). As the

12 Supreme Court has stated, "whether a person has a disability under the ADA is an

13 individualized inquiry." *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 483, 119 S.Ct. 2139,

14 144 L.Ed.2d 450 (1999).  That inquiry often involves factual questions for the trier of fact.

15 *See, e.g., Braverman v. Penobscot Shoe Co.*, 859 F.Supp. 596 (D. Me. 1994).  The Court

16 must determine whether Konrath has presented a genuine issue of material fact that her

17 autoimmune ear disease "substantially limit[ed] one or more of [her] major life activities."

18 42 U.S.C. § 12102(2)(A).  A person is "substantially limited" in a major life activity only

19 if she is "significantly restricted as to the condition, manner, or duration under which she

20 can perform a major life activity" in comparison to an "average person in the general

21 population." *Fraser*, 342 F.3d at 1040.

22      The United States Supreme Court has stated:

23     When addressing the major life activity of performing manual tasks, the central
24     inquiry must be whether the claimant is unable to perform the variety of tasks central
    to most people's daily lives, not whether the claimant is unable to perform the tasks
25     associated with her specific job.

26 *Toyota*, 534 U.S. at 201, 122 S.Ct. at 693.  The Ninth Circuit has stated, in a case involving

27 monocular vision, that the "critical inquiry is whether seeing as a whole is substantially

28 limited for purposes of daily living." *EEOC v. United Parcel Service, Inc.*, 306 F.3d 794,

801 (9th Cir. 2002).  Similarly, the critical inquiry in this case is whether hearing as a whole is substantially limited for purposes of Konrath's daily living.  In this case, a genuine issue of material fact has been presented as to whether Konrath is disabled.

B.  *Employer's Legitimate Expectations*

Konrath asserts that, although on March 26, 2001, Lopez placed her on an improvement plan that required Konrath to develop a written long-term plan, on April 5, 2001, Lopez noted in writing that one of Konrath's strengths was long-range instructional plan and project selection.  Similarly, in April of 2002, Lopez rated Konrath's performance regarding instructional planning as acceptable or beyond expectation.[15]  Although in that same evaluation, Lopez rated Konrath as needing improvement in behavior management and professional attitudes and behaviors, during her deposition Lopez could not remember what observations supported that rating.  The Court finds that Konrath has made a *prima facie* showing that she was performing according to the District's legitimate expectations.

C.  *Adverse Employment Action*

In their Motion, Defendants assert that the contested evaluations do not constitute adverse employment actions because actions short of terminations, demotions, pay cuts, etc., do not constitute the type of adverse employment action necessary to establish a claim of discrimination.  *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 919 n. 3 (9th Cir. 1996); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465 n. 6 (9th Cir. 1994).  However, during oral argument, Defendants agreed that, for purposes of the Motion for Summary, a sufficient showing of an adverse employment action had been made.  The Court will briefly discuss the issue.

Konrath asserts that whether a particular action is materially adverse depends upon

---

[15]Lopez did, however, also inform Konrath that she needed to complete a long-range plan for the art program.

the circumstances of the particular case, and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'"[16] *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. —, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006), *citing Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).  Indeed, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse[.]"  *Burlington*, 548 U.S. —, 126 S.Ct. at 2415.  Konrath asserts that the criticism, negative evaluations, undeserved improvement plans and the preliminary notice of intent not to renew were materially adverse to her.

The Ninth Circuit interprets the requirement for an adverse employment action broadly.  *Ray v. Henderson*, 217 F.3d 1234 (9th Cir. 2000); *see also Strother v. Southern California Permanente Medical Group*, 79 F.3d 859, 869 (9th Cir. 1996) (later transfer constitutes an adverse employment actions); *Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir. 1997) (dissemination of unfavorable job reference an adverse employment action); *Vasquez* (assuming for purposes of *prima facie* case that the issuance of a warning letter constituted an adverse employment action); *but see Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998) (threats and harsh words are not sufficient to constitute adverse employment action in retaliation claim).  Indeed, undeserved negative performance evaluations may qualify as adverse employment actions.  *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).  However, mediocre, "rather than sub-average," evaluations that do not give rise to further negative employment actions do not constitute adverse actions.  *Kortan v. California Youth Authority*, 217 F.3d 1104, 1112-13 (9th Cir. 2000); *see also Lyons v. England*, 307 F.3d at 1118.  In this case, Konrath's employment evaluations

---

[16]In making this argument, Konrath entitles her arguments as regarding retaliation. However, in the body of her argument, Konrath then refers to the alleged disparate treatment that she has received.  The Court will address both disparate treatment discrimination and retaliation.

led to a preliminary notice of non-renewal.  Although the criticism and improvement plans are not so clearly adverse employment actions, in conjunction with the performance evaluations and preliminary notice  of non-renewal, the Court finds Konrath has made a *prima facie* showing that all of this conduct constituted adverse employment actions.

D.  *Similarly Situated Employees Being Treated More Favorably*

In their Objections to and Motion to Strike Certain of Plaintiff's Statement of Facts (Merits), Defendants assert that Konrath has not shown that persons similarly situated to her in all material respects were treated more favorably.  In their Reply, Defendants assert that comparisons between a plaintiff and a co-worker who are not similarly situated is not a valid comparison in determining whether, as an employer, the decisions were pretextual.  However, Defendants do not appear to be arguing that Konrath has failed to make a *prima facie* showing that similarly situated persons were treated more favorably.

The Court notes that, not only must all inferences be drawn in Konrath's favor, but also that the question of similarly situated is generally an issue of fact.  *See Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2nd Cir. 2003) (stating that the question of whether an employee is similarly situated to the plaintiff is ordinarily a question of fact for the jury). In her response, Konrath asserts that other teachers similarly situated in her school were not required to prepare written long-term plans.  Konrath has alleged that other teachers (and has specifically named certain employees) similarly situated have been treated more favorably.  That Defendants disagree whether they are similarly situated does not affect Konrath's showing of this element.  The Court finds Konrath has made a *prima facie* showing that persons similarly situated were treated more favorably.

The Court finds Konrath has made a *prima facie* case of disparate treatment discrimination.

IX.  *Prima Facie Case of Retaliation*

To establish a *prima facie* case of retaliation, Konrath must show that (1) she engaged

1   in protected activity; (2) a materially adverse employment action was thereafter taken

2   against her, and; (3) a causal link existed between the two events.  *McGinest v. GTE*

3   *Services Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004); *Nilsson*, 2007 WL 2669788 *4.

4

5   A.  *Protected Activity*

6       Defendants do not argue that Konrath was not engaged in protected activity.  Indeed,

7   both filing a complaint with the EEOC and complaining of unlawful employment practices

8   to a supervisor are protected activities.  42 U.S.C. § 2000e-3; *Ray v. Henderson*, 217 F.3d

9   at 1240.  Moreover, requesting accommodation is a protected activity.  *See e.g., Mondaine*

10  *v. American Drug Stores, Inc.*, 408 F.Supp.2d 1169 (D.Kan. 2006); *Merit v. Southeastern*

11  *Pennsylvania Transit Authority*, 315 F.Supp.2d 689 (E.D.Pa. 2004).  In fact, the Ninth

12  Circuit Court of Appeals has stated that "vigorously asserting [one's] rights" under the ADA

13  constitutes protected activity.  *McAlindin v. County of San Diego*, 192 F.3d 1226, 1238 (9th

14  Cir. 1999); *see also Pardi v. Kaiser Foundation Hospitals*, 389 F.3d 840, 850 (9th Cir.

15  2004).  The Court finds Konrath has made *prima facie* showing that she was engaged in

16  protected activity.

17

18  B.  *Adverse Employment Action*

19      As previously stated, the criticism, negative evaluations, improvement plans and

20  preliminary notice of nonrenewal constituted adverse employment actions for purposes of

21  the *prima facie* showing.

22

23  C.  *Causation*

24      "At the prima facie stage of a retaliation case, 'the causal link element is construed

25  broadly so that a plaintiff merely has to prove that the protected activity and the negative

26  employment action are not completely unrelated.'"  *Poland v. Chertoff*, 494 F.3d 1174, 1181

27  n.2 (9th Cir. 2007), *quoting Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir.

28  2001).  "Causation sufficient to establish the third element of the prima facie case may be

inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protection action and the allegedly retaliatory decision." *Yartzolff*, 809 F.2d at 1376.  When adverse employment decisions are made within a reasonable period of time after a plaintiff has engaged in protected activity, retaliatory intent may be inferred.  *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 507 (9th Cir. 2000).  Indeed, the timing of the adverse employment action alone can be sufficient to meet the initial burden placed on a plaintiff.  *See e.g., Strother* (termination one day after filing of administrative complaint was enough evidence alone to meet burden); *Miller v. Fairchild Industries, Inc.*, 885 F.2d 498, 505 (9th Cir. 1989) (terminations 42 and 59 days after EEOC conferences and signing of EEOC settlements were sufficient to establish a *prima facie* case of causation).

Defendants do not assert that they were not aware of the protected activity.  Indeed, Konrath made the requests for reasonable accommodations and submitted grievances to Defendants.  The Court notes that temporal proximity exists between protected activity and alleged retaliatory conduct for the actions Konrath asserts constitute "prior acts."  Moreover, approximately eight months after the filing of the EEOC complaint, Lopez provided Konrath with a negative evaluation.  Konrath appears to acknowledge that this alleged retaliatory conduct is not temporally proximate to the protected activity, but asserts that this was the first opportunity, after the filing of the EEOC complaint, for Lopez to evaluate Konrath.  The cases discussing the inference that can be raised from temporal proximity deal with shorter periods of time.  However, in light of the evaluations consistently being conducted in the spring of each school year and the temporal proximity of the "other acts," the Court finds Konrath has made a sufficient *prima facie* showing of causation.

The Court finds Konrath has made a *prima facie* case of retaliation.

X.  *Legitimate Nondiscriminatory Reasons*

Because Konrath has presented prima facie cases of disparate treatment discrimination and retaliation, the Court must now consider whether Defendants have shown

a legitimate, nondiscriminatory reason for their action.   This burden is satisfied by admissible evidence and "can involve no credibility assessment." *Reeves*, 530 U.S. at 142, 120 S.Ct. at 2106.   It is "significantly less than proving the *absence* of discriminatory motive." *Lynn v. Regents of Univ. of Calif.*, 656 F.2d 1337, 1344 (9th Cir. 1981). Subjective criteria may satisfy an employer's burden. *Chapman v. AI Transport*, 229 F.3d 1012, 1034 (11th Cir. 2000) (employer's testimony that plaintiff was not sufficiently aggressive and gave imprecise answers were nondiscriminatory reasons supporting summary judgment for the employer). In reviewing the record, this Court "should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes form disinterested witnesses.'" *Reeves*, 530 U.S. at 151, *quoting Liberty Lobby*, 477 U.S. at 300.

In this case, Lopez required all teachers under her supervision to have some form of long-term instructional plan.   Defendants assert that, because Konrath was unable or unwilling to describe the goals, objective, and behaviors expected of students over an extended period of time, Lopez noted in Konrath's evaluations that she needed to improve her long-range instructional planning.   This legitimate, nondiscriminatory reason for Defendants actions would appear to dispel the inference of discrimination raised by Konrath's *prima facie* case.   Although the Court can consider the subjective reasons of an employer, the Court recognizes that Lopez is not a disinterested witness.   In light of Lopez' testimony that it was not a fact that Konrath could not hear in the classroom, and the material factual dispute whether the District engaged in an interactive good faith process to determine an appropriate accommodation, the Court finds that Defendants have not set forth a legitimate, non-discriminatory reason for their conduct.[17]

Moreover, even if Defendants had established a legitimate, non-discriminatory reason for their conduct, the Court would then consider whether Konrath had satisfied her burden

---

[17]The Court also notes that Jaeger testified that what Konrath wanted is not necessarily what she needed.  He clarified this statement to reflect his belief that what she needed should be a medical determination.

of proving the legitimate reasons offered by Defendants were not their true reasons, but merely a pretext for discrimination; i.e., that "the employer's proffered explanation is unworthy of credence." *Reeves*, 530 U.S. at 143, 120 S.Ct. at 2106, internal quotes omitted. Where a plaintiff demonstrates the "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in an employer's proffered reason, an issue of fact is raised as to whether Defendants' reasons are a pretext for discrimination. *Brewer v. Quaker Oil Refining Corp.*, 72 F.3d 326, 331 (3rd Cir. 1995); *see also Reeves*, 530 U.S. at 148, 120 S.Ct. at 2109 (defendants are entitled to judgment as a matter of law if (1) the record conclusively reveals some other, nondiscriminatory reason for the employer's decision or (2) plaintiff creates only a weak issue of fact as to whether defendants' reasons are untrue and there is "abundant and uncontroverted independent evidence that no discrimination had occurred").

In support of her assertion that Defendants' reasons are pretextual, Konrath asserts that her "needs improvement" evaluations only occurred after Konrath disclosed her disability. She further asserts that she was required to prepare a written long term plan only after she complained in writing to Jaeger about Lopez' failure to accommodate her requests for reasonable accommodation. Although Lopez then rated Konrath as "at or beyond" expectation in April 2002, after Konrath filed a Charge of Discrimination, Lopez placed Konrath on her second improvement plan. Although Lopez had stated that Konrath's students showed limited evidence of completion of art work, Konrath exhibited student art work in various displays, Konrath had a website that allowed parents to see the art created by the children, and Lopez stated that she did not see all of the work produced by the children. Moreover, there is a factual dispute as to whether Lopez provided adequate explanation to Konrath as to what was required in the long-range plan. The Court finds that Konrath has shown weaknesses and inconsistencies in the proffered reasons. Additionally, as previously stated, there is a factual dispute as to whether other teachers similarly situated

1    were treated more favorably – this also shows weaknesses in Defendants' reasons.[18]

2    Moreover, in determining whether Konrath could show an issue of fact as to whether

3    defendants' reasons are untrue, this Court would consider that the evidence to support

4    Defendants' reasons is not independent, i.e., from disinterested witnesses. *See Reeves*, 530

5    U.S. at 150, 120 S.Ct. at 2110; *Winarto v. Toshiba America Electronics*, 274 F.3d 1276,

6    1283 (9th Cir. 2001). In other words, even if Defendants had established legitimate, non-

7    discriminatory reasons for the conduct, summary judgment would not be appropriate.

8

9    XI.  *Contract Claims*[19]

10          To establish a contract claim, a plaintiff must show a contract, a breach of contract,

11   and damages.  *Graham v. Asbury*, 112 Ariz. 184, 185, 540 P.2d 656, 657 (1975).

12   Defendants asserts that Konrath cannot show that she has suffered any economic damages.

13   Further, Defendants assert that Konrath cannot recover any tort damages on her alleged

14   breach of an employment contract. *Nelson v. Phoenix Resort Corp.*, 181 Ariz. 188, 197-98,

15   888 P.2d 1375, 1384-85 (App. 1994). Defendants assert that Konrath has been paid for all

16   sick days and that she has not sustained any economic damages associated with her using

17   those sick days. In her response, Konrath does not address this claim. However, in her

18   Separate Statement of Facts and Response to Defendant's Separate State of Facts

19   (Substantive Claims), Konrath asserts that the sick days that she has been paid for will be

20   deducted from her sick day "bank" upon retirement, thereby causing a monetary loss.

21

22          [18]The Court does not find that Konrath's historical ratings are relevant to this issue as

23   they do not reflect ratings under the requirements of Lopez. Konrath has not provided any

24   basis for this Court to conclude that Lopez was not authorized to require a long-term plan and
     the format of that long-term plan.

25          [19]In her Complaint, Konrath alleges that she has "a claim against [the District] for

26   breach of her implied contractual rights." Complaint, p. 3. The Complaint does not further

27   specify her contract claim. In the June 7, 2004, Joint Report, Konrath stated that the District
     refused "to honor its promise of taking [] grievances through the different levels" and failed

28   to comply with its own grievance policy. Joint Report, pp. 2 and 4.

Separate Statement, p. 20.  Moreover, during oral argument, Konrath argued that, if a plaintiff knows she will incur damages, she is not required to wait for the damages to occur. Indeed, the "general rule is that a cause of action for a breach of contract accrues immediately upon the happening of the breach, even though the actual damages resulting therefrom may not occur until afterward." *Enyart v. Transamerica Ins. Co.*, 195 Ariz. 71, 76, 985 P.2d 556, 561 (App. 1998). The Court finds summary judgment in favor of Defendants is not appropriate on this claim.

Konrath asserts, however, that Defendants have breached the terms of the employer manual by failing to comply with the requirement that the "Board shall take official action within 21 days after receipt of the mediator's recommendation, or within 21 days of receiving the aggrieved party's and/or Associations request to move directly from Level Two to Level Four." District Policy G-1805; *see also* Plaintiff's Separate Statement of Facts and Response to Defendant's Separate Statement of Facts (Substantive Claims), ¶¶ 110 and 111.  Defendants assert that this claim of a contract breach must also fail because Konrath has not shown any damages.  Arizona courts have required plaintiffs to prove compensable damages, i.e., that they have been economically damaged.  *See Mammas v. Oro Valley Townhouse, Inc.*, 131 Ariz. 121, 638 P.2d 1367 (App. 1981).[20]  The Court finds that no factual issue in dispute establishes that Konrath suffered any monetary damages.  The Court finds that summary judgment in favor of Defendants is appropriate on this claim.

XII.  *Tortious Interference with a Contract*

Defendants also assert that summary judgment on the claim of tortious interference with a contract is appropriate because Konrath cannot show that she sustained any damages that are recoverable in contract and because, as supervisors, Lopez and Jaeger cannot be

---

[20]Injunctive relief preventing a party from breaching a contract is an order of specific performance, *The Power P.E.O., Inc. v. Employees Ins. of Wausau*, 201 Ariz. 559, 38 P.3d 1224 (App. 2002), that, if requested, would not require monetary damages.  However, Konrath's Complaint does not request any injunctive relief.

1   liable for tortious interference.  "The traditional elements of the tort of inducing breach of

2   contract are:  (1) an existing contract between the plaintiff and a third party; (2) defendant's

3   knowledge of this contract; (3) an intentional unjustified inducement to breach the contract;

4   (4) a subsequent breach by the third party; and (5) resulting damage to plaintiff."  *Ulan v.*

5   *Vend-A-Coin, Inc.*, 27 Ariz.App. 713, 717, 558 P.2d 741, 745(1976).  Konrath alleges that

6   Lopez and Jaeger interfered with her employment relationship with the District.  However,

7   the facts as set forth by  Konrath indicate that the allegation is that Lopez and Jaeger

8   interfered with the *renewal* of her contract.  *See e.g., Wallace v. Casa Grande Union High*

9   *School Dist. No. 82 Bd. of Governors*, 184 Ariz. 419, 909 P.2d 486, 495 (App. 1995) (non-

10  tenure teacher had no right to continued employment, i.e., renewed contract with the same

11  terms and conditions).  Further, an "employer cannot interfere with its own contract."  *Payne*

12  *v. Pennzoil Corp.*, 138 Ariz. 52, 57, 672 P.2d 1322, 1327 (App. 1983).  Konrath has not

13  alleged that Lopez and Jaeger were not acting in their employment capacities when they are

14  alleged to have interfered with the contract.  In such circumstances, "they cannot be liable

15  for interference with another employee's relationship with the employer."  *Kelley v. City of*

16  *Mesa*, 873 F.Supp. 320, 333 (D.Ariz. 1994), *citing Payne*; *see also Mintz v. Bell Atlantic*

17  *Systems Leasing Intern., Inc.*, 183 Ariz. 550, 905 P.2d 559 (App. 1995) (distinguishing

18  supervisor liability with the tort of wrongful discharge versus the non-existent tort of failure

19  to promote).  Summary judgment in favor of Defendants is appropriate on this claim.

20          Accordingly, IT IS ORDERED:

21      1.      The referral to the Honorable Charles R. Pyle is terminated;

22      2.      The Motion for Sanctions for Spoliation of Evidence against Defendants [Doc.

23  # 65] is GRANTED in part and DENIED in part.

24      3.      Defendants shall pay Konrath's reasonable attorney's fees for the preparation

25  and completion of the pleadings and argument regarding the Motion for Sanctions for

26  Spoliation of Evidence and for the depositions of other teachers regarding the long-term

27  plans.  The parties may submit pre-trial pleadings regarding whether an adverse jury

28  inference instruction and /or an appropriate restriction on evidence at trial is appropriate.

1    4.    Counsel for Konrath shall submit an affidavit of attorneys' fees within thirty
2  (30) days of this Order.

3    5.    Defendants' Objections to and Motion to Strike Certain of Plaintiff's
4  Statements of Facts (Merits) [Doc. # 99] is DENIED.

5    6.    Defendants' First Motion for Summary Judgment (Statutes of Limitations)
6  [Doc. # 83] is GRANTED in part and DENIED in part.

7    7.    Summary Judgment is granted in favor of Defendants and against Konrath as
8  to any ADA or retaliation claims regarding incidents that occurred more than 240 days prior
9  to the August 8, 2002, Charge of Discrimination.

10    8.    Summary Judgment is granted in favor of Defendants and against Konrath as
11 to any state law claims regarding Konrath's sick days that post-date Konrath's submission
12 of her Notice of Claim.

13    9.    Defendants' Second Motion for Summary Judgment (Substantive Issues) [Doc.
14 # 85] is GRANTED in part and DENIED in part.

15    10.    Summary Judgment is granted in favor of Defendants and against Konrath as
16 to Konrath's contract claim that Defendants have breached the terms of the employer manual
17 by failing to comply with the requirement that the "Board shall take official action within
18 21 days after receipt of the mediator's recommendation, or within 21 days of receiving the
19 aggrieved party's and/or Associations request to move directly from Level Two to Level
20 Four."  District Policy G-1805.

21    11.    Summary Judgment is granted in favor of Defendants and against Konrath as
22 to Konrath's tortious interference claim.

23    12.    The parties shall file their joint proposed pretrial order within thirty (30) days
24 of this Order.

25    DATED this 26th day of September, 2007.

26

27    _____
28    Cindy K. Jorgenson
      United States District Judge